**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
ELKINS DIVISION**

**LEATHA C. IRVIN,**

   **Plaintiff,**

**v.**          **Civil Action No.: 2:13-CV-52
(JUDGE BAILEY)**

**CAROLYN W. COLVIN,
Acting Commissioner of Social Security,**

   **Defendant.**

## REPORT AND RECOMMENDATION

## I.  INTRODUCTION

On August 1, 2013, Plaintiff Leatha C. Irvin ("Plaintiff"), by counsel Brian D. Bailey, Esq., filed a Complaint in this Court to obtain judicial review of the final decision of Defendant Carolyn Colvin, Acting Commissioner of Social Security ("Commissioner" or "Defendant"), pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g). (Complaint, ECF No. 1). On October 28, 2013, the Commissioner, by counsel Helen Campbell Altmeyer, Assistant United States Attorney, filed an answer and the administrative record of the proceedings. (Answer, ECF No. 9; Administrative Record, ECF No.10, 11, 12, 13). On November 18, 2013, and December 16, 2013, Plaintiff and the Commissioner filed their respective Motions for Summary Judgment. (Pl.'s Mot. for Summ. J. ("Pl.'s Mot."), ECF No. 16; Def.'s Mot. for Summ. J. ("Def.'s Mot."), ECF No. 18). Following review of the motions by the parties and the administrative record, the undersigned now issues this Report and Recommendation to the District Judge.

## II.  BACKGROUND

## A.    *Procedural History*

On July 16, 2010, Plaintiff protectively filed her first application under Title II of the Social Security Act for Disability Insurance Benefits ("DIB") and a Title XVI application for Supplemental Security Income ("SSI"), alleging disability that began on March 13, 2010. (R. at 164). The claim was initially denied on October 7, 2010, (R. at 105) and denied again upon reconsideration on February 3, 2011 (R. at 115). On March 22, 2011, Plaintiff filed a written request for a hearing (R. at 124), which was held before United States Administrative Law Judge ("ALJ") Mark M. Swayze on February 9, 2012 in Morgantown, West Virginia. (R. at 38). Plaintiff, represented by counsel Brian D. Bailey, Esq., appeared and testified, as did Eugene Andrew Czuczman, an impartial vocational expert. (*Id.*). On March 21, 2012, the ALJ issued an unfavorable decision to Plaintiff, finding that she was not disabled within the meaning of the Social Security Act. (R. at 14-31). On July 3, 2013, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (R. at 1-6).

## B.    *Personal History*

Plaintiff was born on March 19, 1963, and was forty-seven (47) years old at the time she filed her first SSI claim. (R. at 49). At the time of the hearing, Plaintiff was married with two children and two grandchildren. (R. at 50-51). Plaintiff obtained her Associate Degree in Nursing and worked for fifteen years as a nurse and nurse manager at Stonewall Jackson Memorial Hospital. (R. at 54, 56).

## C.    *Medical History*

Plaintiff's presenting medical issues include rheumatoid arthritis, diabetic neuropathy, diabetic foot ulcers, edema, obstructive sleep apnea, COPD as well as a mental depressive

disorder. (R. 44-46). While the ALJ found Plaintiff has numerous severe impairments, at issue before the Court is Plaintiff's diabetic neuropathy and resulting foot ulcers. While the undersigned reviewed all of the medical records in this case, the following summary only pertains to those relevant records involving Plaintiff's diabetic neuropathy and resulting foot ulcers.

1. **Medical History Included in Record for ALJ**

Plaintiff's treating physician, Dr. Haritha Narla noted paresthesias in Plaintiff's feet on November 24, 2009 (R. at 525) and toes on February 16, 2010 (R. at 522).

On September 14, 2010, treatment providers at Stonewall Jackson Memorial Hospital noted foot ulcers. (R. at 627, 639). From November 27 to November 29, 2010, Plaintiff was admitted to Stonewall Jackson Memorial Hospital for treatment of a right foot ulcer. (R. 651, 665, 671). Plaintiff reported experiencing pain in her foot for days prior to her admission to the hospital. (R. at 668). The ulcer was the size of a nickel/quarter on the ball of Plaintiff's right foot and was "draining serious fluid." (R. at 737). The skin around the ulcer was open and she had redness to her inner heel and medial side of the sole of her foot. (R. at 670, 737). Plaintiff also had an open area on her left great toe. (R. at 747). Plaintiff was discharged with orders to follow-up with outpatient physical therapy and to continue her antibiotic treatment for the ulcer. (R. at 684).

On January 21, 2011, Dr. Mahmoud, Plaintiff's treating physician, noted a right foot ulcer. (R. at 875). On January 26, 2011, Dr. Mahmoud wrote a letter stating that Plaintiff has multiple medical problems, including a right foot ulcer and opined that Plaintiff would be unable to return to work. (R. at 874).

On May 26, 2011, Plaintiff presented for diabetic foot care to Dr. Anderson, a podiatrist. (R. 866). Plaintiff presented with painful toenails and numbness of the feet. (*Id.*). Dr. Anderson

3

noted that Plaintiff performed poorly on her loss of protective sensation ("LOPS") exam. (*Id.*). Plaintiff received prescription shoes and molded inserts to help prevent pedal ulceration. (R. at 867, 878).

On June 6, 2011, Dr. Adnan Alghadban, a neurologist, sent Dr. Mahmoud a letter regarding his recent examination of Plaintiff. (R. at 898-99). Dr. Alghadban stated that Plaintiff complained of numbness and tingling in her lower extremities that is getting worse. (R. at 898). A sensory physical examination revealed "decreased pinprick and touch in a stocking distribution" and the absence of reflexes in the ankles. (*Id.*). Dr. Alghadban concluded that the "electromyogram nerve conduction study was suggestive of neuropathy" and he prescribed Topamax. (*Id.*; R. at 905-08).

On June 11, 2011, Dr. Bennett Orvik, a consultative examiner, noted no evidence of ulcerations on Plaintiff's extremities but did note edema of the ankles and occasional numbness in Plaintiff's toes. (R. at 585). At the time of this appointment, "she could walk some on her heels and some on her toes" and Dr. Orvik noted "she can sometimes walk 100 feet, but usually is limited to approximately 50 feet." (R. at 586). Dr. Orvik concluded that Plaintiff's previous work as a nurse "requires her to do more walking than she can tolerate." (R. at 587).

On June 28, 2011, Plaintiff presented for diabetic foot care, specifically the debridement of mycotic toenails. (R. at 866). Dr. Anderson assessed Plaintiff's condition as non-insulin dependent diabetes mellitus ("NIDDM"), high risk foot, onychomychosis and neuropathy. (*Id.*).

On July 25, 2011, Plaintiff returned to Dr. Alghadban for a follow-up appointment. (R. at 900). Plaintiff continued to present with decreased pinprick and touch in stocking distribution and the absence of reflexed in the ankles, but Plaintiff reported some response to Topamax. (*Id.*).

## 2. New Medical Evidence Presented to Appeals Council

### a. Treating Physician Letter

The new evidence submitted to the Appeals Council included a letter from Plaintiff's treating physician, Dr. Mahmoud. (R. at 935). In the letter, Dr. Mahmoud describes the development of Plaintiff's bilateral lower leg neuropathy in 2010 stemming from her diabetes. (*Id.*). He notes that a side effect of the neuropathy and loss of nerve endings is the development of ulcers on her feet. (R. at 936). Dr. Mahmoud states that Plaintiff developed an ulcer in November 2010, which finally abated six month later in May 2011 following aggressive treatment, receiving general wound care and elevating her legs as often as possible. (*Id.*). Plaintiff again developed ulcers in both feet by December 2011. (*Id.*). She was referred to a podiatrist as well as the United Hospital's Wound Care Center. (*Id.*). Dr. Mahmoud states that "she easily develops foot ulcers which require intensive, lengthy and aggressive treatment." (*Id.*). Dr. Mahmoud ultimately opines that Plaintiff is unable to return to work. (*Id.*).

### a. New Medical Records

The additional medical evidence provided to the Appeals Council included medical records regarding the diagnosis and treatment of Plaintiff's foot neuropathy and foot ulcers from August 30, 2011 through the date of the ALJ's decision, March 21, 2012.

On August 30, 2011, Plaintiff presented to an appointment with Dr. Anderson having difficulty with her foot neuropathy. (R. at 939). Dr. Anderson noted bilateral paresthesias from Plaintiff's ankles to her toes, but noted no signs of trauma, infection or gout. (*Id.*). Plaintiff was diagnosed as having severe diabetic neuropathy, bilateral, stable. (*Id.*). Dr. Anderson discussed proper diabetic foot care and shoe gear with Plaintiff. (*Id.*). Dr. Anderson also performed a

percutaneous transthoracic needle biopsy ("PTNB") on Plaintiff's feet to decrease pain and paresthesias. (*Id.*).

On November 30, 2011, Plaintiff had an appointment with Dr. Mahmoud and presented with pain in her knees, hands and ankles. (R. at 943). Dr. Mahmoud's handwritten notes do not appear to indicate the presence of an ulcer.

On December 11, 2011, Plaintiff had a follow-up appointment with Adnan Alghadban, M.D., at Associated Specialists, Inc. (R. at 946). The examination showed decreased pinprick and touch in Plaintiff's feet and reflexes were absent in the ankles. (*Id.*). Dr. Alghadban increased her prescription medication and recommended a follow-up in one month. (*Id.*).

On December 29, 2011, Plaintiff presented to the Stonewall Jackson Memorial Hospital with a diabetic ulcer on her left foot and mild cellulitis. (R. at 977). Dressing was applied to the wound and Plaintiff was discharged with wound care instructions. (R. at 980, 990).

On January 14, 2012, Plaintiff presented to Stonewall Jackson Memorial Hospital Emergency Department with a right second toe ulcer. (R. at 952). Plaintiff received a post-op shoe, antibiotics, and was discharged. (R. at 955, 959). While admitted, Dr. Mark Hackney, M.D., reviewed x-rays of Plaintiff's right foot which revealed calcaneal spurring and soft tissue swelling of the second digit. (R. at 968).

On January 19, 2012, Plaintiff met with Dr. Anderson and reported that she was in the emergency room five days prior for a foot ulcer. (R. at 939). Dr. Anderson noted ulcers on Plaintiff's right second toe and medial left toe, which were debrided. (*Id.*). Plaintiff's right ulceration also had a bit of abscess to it and Dr. Anderson performed an incision and drainage of the wound. (*Id.*). Dr. Anderson discussed proper diabetic control and wound care; he also

recommended he continue wearing her post-op shoe. (*Id.*). Plaintiff also received an antibiotic injection as well as oral medication. (*Id.*).

On January 26, 2012, Plaintiff presented with redness in her right toe and a grade two ulcer on her left toe. (R. at 938). Dr. Anderson performed an "aggressive debridement" of the left foot and Plaintiff received an antibiotic prescription for her right foot. (*Id.*).

On February 7, 2012, Plaintiff again presented to Dr. Anderson now with a grade three ulceration on her toe, which was debrided. (R. at 938). The wound was not healing and Plaintiff was referred to United Hospital's Wound Care Center for an appointment on February 13, 2012. (R. at 998).

On February 13, 2012, Plaintiff visited the Wound Care Center for treatment of an ulcer on her second toe, right foot. (R. at 1007, 1015, 1041). Plaintiff reported intermittent burning pain at a five on a scale of zero to ten. (R. at 1041). The wound was described as a diabetic Wagner grade one ulcer. (*Id.*). A Hyperbaric Screening Checklist lists the wound start date as December 13, 2011. (*Id.*). The nurse's notes indicate that Plaintiff had failed would care for thirty days or more. (*Id.*). Plaintiff's wound did not show chronic refractory osteomyelitis, necrotizing fasciitis, or osteoradionecrosis. (*Id.*). A microbiology laboratory report dated February 13, 2012 from United Hospital Center showed no anaerobe cultures from a tissue culture taken from Plaintiff's second toe wound. (R. at 997, 1003). A photograph of Plaintiff's toe is included in the record dated February 13, 2014. (R. at 1011). The wound was debrided and a tissue culture was taken. (R. at 1043). Plaintiff was given medication and directions on applying dry dressing to the wound. (R. at 1042).

On February 22, 2012, Plaintiff presented to Wound Care Center with a chronic ulcer on

her right second toe distally and a second ulcer on her left planter foot. (R. at 996, 1037). Plaintiff did not report any pain at this time. (R. at 1037). X-rays revealed osteopenia, calcaneal spurs and soft tissue swelling of the distal second digit toe but no osseous erosive process was noted. (*Id.*). The toe wound was classified as a Wagner grade one diabetic wound with an onset of February 15, 2012. (R. at 1012). The record also contains a photograph of the ulcer. (*Id.*). Both ulcers were debrided at the skin, epidermis level. (R. at 1039). Plaintiff was directed to continue applying medication to both wounds and using a buttress pads for her right foot. (R. at 1038).

On February 29, 2012, Plaintiff visited the Wound Care Center with a grade two ulcer on her right second toe and a second ulcer on her left planter foot, which was deemed "resolved." (R. at 1033). Plaintiff did not report experience any pain at this time. (*Id.*). The record contains a photograph of the ulcer on Plaintiff's toe. (R. at 1010). X-ray results were also reviewed, which showed no bone erosion or bone infection but moderate mid-foot arthritis was noted. (*Id.*). The ulcer on the right two was debrided, Plaintiff received a steroid injection and was told to continue using the buttress pad for the wound and to perform "minimal walking." (R. at 1034, 1036).

On March 1, 2012, Dr. Mahmoud noted that Plaintiff was still receiving wound care for a diabetic ulcer on her left foot. (R. at 940).

On March 21, 2012, Plaintiff presented to the Wound Care Center with a grade two diabetic ulcer on her right second toe. (R. at 1029). There were no infection signs and only minor drainage. (R. at 1032). Plaintiff reported no pain at the time. (*Id.*). The record contains a photograph of the ulcer on Plaintiff's toe. (R. at 1013). The ulcer was debrided at the dermis level and Plaintiff was directed to apply a topical medication and cover the wound with a buttress pad. (R. at 1029-30).

The ALJ's decision was dated March 21, 2012, therefore, the records submitted concerning treatment after this date will not be addressed.

**D.      *Testimonial Evidence***

At the ALJ hearing held on February 9, 2012, Plaintiff testified that she is married and lives in a household with seven people, including her husband, son, daughter, two grandchildren, a nephew and one non-relative adult. (R. at 50-51). Her husband is disabled and not employed; he currently receives Social Security benefits. (R. at 55).

Plaintiff first received her Licensed Practical Nurse diploma and then obtained her Associate Degree in Nursing around 2006. (R. at 54). In regard to employment, Plaintiff worked as a registered nurse ("RN") at Stonewall Jackson Memorial Hospital for fifteen (15) years and also worked at Holbrook Nursing Home as a licensed practical nurse ("LPN"). (R. at 57). At Stonewall Jackson, Plaintiff first worked as a LPN, then as an RN and was eventually promoted to a nurse manager with supervisory duties. (R. at 56). Plaintiff worked as a nurse manager in an attempt to "get off the floor, because I knew I was starting to have problems with my legs" and the position allowed for more desk work. (R. at 57). Plaintiff testified that she began experiencing problems with work attendance towards the end of her employment as a result of her medical conditions. (R. at 68). Plaintiff eventually quit working in March 2010 because "I just couldn't work anymore. I finally gave up trying to get there." (R. at 56). Plaintiff is currently unemployed, receives food stamps and uses a medical assistance card. (R. at 55).

Plaintiff further testified that her most serious medical problem affecting her ability to work is her diabetic neuropathy and accompanying foot ulcers. (R. at 59). Plaintiff explained that she "can't sit down or stand up for very long and when the pain starts or when that tingling starts, I

have to lay down." (*Id.*). Plaintiff experiences pain in her feet, ankles and lower legs, which started approximately five to seven years prior. (R. at 60). Due to the neuropathy, Plaintiff lacks feeling in her feet and explained: "I could step on things or kick against things and I don't feel it." (R. at 60).

In regard to foot ulcers, Plaintiff testified that due to the neuropathy, she often does not realize she has an ulcer until she experiences pain in another part of her foot. (R. at 61). Plaintiff explained that the ulcers are often deep and extend "two or three layers into the skin" with a callus area surrounding the wound. (*Id.*). Plaintiff presented at the hearing wearing a medical shoe on her right foot, which she wears to prevent the ulcer from rubbing or hitting other surfaces and worsening. (R. at 62). Plaintiff reported that she had her current ulcer for approximately three months and had recently been referred to a wound specialist because the ulcer would not heal. (*Id.*). Plaintiff testified that she had been experiencing ulcers for approximately a year and half. (*Id.*). Plaintiff stated that the ulcers make it difficult to walk so she favors one foot while the other is healing, which then results in new ulcers developing in the other foot. (R. at 63). Plaintiff testified that pain "shoots right up my leg" when she bumps the ulcer against something. (*Id.*). Plaintiff explained that her ulcers were being treated by Dr. Anderson, a podiatrist, that she has visited the emergency room a number of times for the ulcers and that she has recently been referred to a wound care specialist. (R. at 75).

In addition, Plaintiff testified that she experiences swelling in both ankles and feet and frequently in her knees. (R. at 75). Plaintiff stated that the swelling is worse after walking and "if I don't keep my legs up," there will be swelling in her feet "all of the time." (*Id.*). Plaintiff testified she elevates her feet to waist level every day for about thirty minutes, every three hours. (R. at 65). Plaintiff explained that in some instances, depending on the pain, she must lay completely down.

(R. at 64). Plaintiff stated that after being awake at 7:00 a.m., she typically needs to lay down by 1:00 p.m. and rest for about thirty minutes to one hour before she can get up again. (R. at 64).

Plaintiff also testified regarding her arthritic conditions, which result in joint pain. (R. at 65). Plaintiff explained that she experiences "flare-ups" in joint pain that occur no less than once a week. (R. at 68). During one of these "flare-ups," Plaintiff testified that she would not be able to go into work. (*Id.*). Plaintiff stated that in one instance she had to be admitted to the hospital and have fluid removed due to pain she was experiencing in her leg. (R. at 66-67).

Plaintiff further testified regarding other medical conditions, such as her depression (R. at 71), sleep apnea (R. at 73) and carpal tunnel syndrome (R. at 76).

Plaintiff testified regarding her daily activities. Plaintiff testified that she drives approximately once a week for about fifteen or twenty miles. (R. 52). In regard to household chores, Plaintiff explained that she can assist with chores around the house when she is having a "good day." (R. at 72). Plaintiff stated that she no longer cooks large meals like she used to, but on good days she is able to "cook some." (*Id.*). On bad days, she is unable to cook at all (*Id.*). Plaintiff also explained that she does chores like washing clothes and cleaning when she is able. (R. at 72). During the day, Plaintiff watches television. (R. at 73). Plaintiff belongs to a church and the Eastern Star group, but she cannot go very often and cannot hold any office positions because she cannot guarantee her attendance. (R. at 73).

Plaintiff's attorney asked her if she thought she would able to work on a set schedule even if she could sit down whenever she wanted, to which Plaintiff responded "probably not." (R. at 74-75). Plaintiff explained that some days she is fine while other days she moves slower and on some days she "can't get ready at all." (R. at 75).

## E.     *Vocational Evidence*

Also testifying at the hearing was Eugene Andrew Czuczman a vocational expert. Mr.

Czuczman characterized Plaintiff's past work as a licensed practical nurse as medium exertion and

skilled. (R. at 79). Work as a resident nurse is customarily medium exertion and skilled. (R. at 80).

Both positions, at times, require lifting over one-hundred (100) pounds, which classifies the

positions at a very heavy exertion at times. (R. at 79-80). Work as a nurse manager is customarily

light exertion and skilled. (R. at 80).

With regards to Plaintiff's ability to return to her prior work, Mr. Eugene Andrew

Czuczman gave the following responses to the ALJ's hypothetical:

> Q:     Would you assume a hypothetical individual of the same age, education and
> work experience as the claimant, who retains the capacity to perform light
> work with the following limitations, no more than occasional postural
> movements which include stooping, kneeling, crouching, crawling,
> climbing of ramps and stairs; no balancing or climbing of ladders, ropes or
> scaffolds.
>
> There should be no more than frequent left-side handling; no foot-control
> operation bilaterally. The work should afford a sit/stand option that allows
> the person to alternate sitting or standing positions at 30-mnute intervals
> throughout the workday, without breaking task.
>
> The work should avoid concentrated exposure to extreme hot and cold
> temperatures, wetness, humidity, irritants such as fumes, odors, dust, gases
> and poorly ventilated areas and should avoid even moderate exposure to
> vibrations and hazards, including dangerous machinery and unprotected
> heights.
>
> The work should be limited to tasks involving short, simple, instructions in
> a low-stress environment defined as having only occasional
> decision-making required and only occasional changes in the work setting
> with no fast-paced production work and there should be no more than
> occasional interaction with the public, supervisor and co-workers.
>
> Can this hypothetical individual perform any of the past work of the
> claimant, as actually performed or as customarily performed per the *DOT*?

A:    No, Your Honor.

Q:    Are there other jobs in the regional or national economy that this hypothetical individual could perform?

A:    Yes, sir. [The] following are light in exertion…unskilled work. Folding machine operator…photographic machine operator…inerting machine operator…and that is a sampling.

(R. at 80-81).

Incorporating the above hypothetical, the ALJ then questioned Mr. Czuczman regarding Plaintiff's ability to perform sedentary work with all of the other non-exertional limitations from the previous hypothetical. Mr. Czuczman stated that the hypothetical claimant could work as a "document preparer…imprinter…type copy examiner" as a sampling. (R. at 82).

The ALJ then questioned Mr. Czuczman regarding the customary number and length of breaks permitted during the workday and the number of absences typically tolerated. (R. at 82). Mr. Czuczman explained that if a person was "late to work twice a week up to ten minutes each time" or missed "more than two days a month consistently" that would not be tolerated. (*Id.*). Mr. Czuczman also testified regarding the typical breaks allowed during the workday. (R. at 83-84). Mr. Czuczman testified that an employee would be allowed to elevate one or both lower extremities at waist level during their regularly scheduled breaks, but if outside those times, the need to elevate legs at waist level for longer than five minutes twice a day would not be tolerated. (*Id.*).

Plaintiff's attorney questioned Mr. Czuczman as well. Mr. Czuczman testified that a person would not be allowed to lie down in supine position outside of normal breaks. (R. at 85). Mr. Czuczman also confirmed that a person could not miss more than two days of work a month

13

without being terminated. (R. at 86).

## F.     *Lifestyle Evidence*

On an adult function report dated July 7, 2009, Plaintiff stated that while she tries to perform normal household duties, such as laundry, housework and cooking, such activities take her longer to complete then before her medical conditions. (R. at 194). She is also limited in her ability to lift or carry heavy objects, such as putting away dishes or carrying loads of laundry. (R. at 196). Plaintiff cares for her schizophrenic husband by helping him with his medication, going to the doctor with him and aiding with his hygiene. (R. at 195). Plaintiff states she is able to go up and down steps but she cannot walk very far at any one time. (*Id.*). She states that she can walk for about 100 feet before needing to rest for several minutes. (R. at 199). In regard to personal care, Plaintiff notes she is able to care for herself but it takes her much longer to perform each activity. (R. at 195). For meals, Plaintiff said she can prepare simple meals on a daily basis if she is able to sit down by the stove while cooking. (R. at 196). Plaintiff is able to shop for household supplies and food a couple of times a week but she uses a mechanical cart while at the store. (R. at 197). As for hobbies and interests, Plaintiff reports that she watches television daily, attends church weekly and visits her children's homes on a weekly basis. (R. at 198). She reports that she does not do these activities as often as she did prior to the onset of her medical conditions. (*Id.*).

Plaintiff's second adult function report dated August 10, 2010 is largely consistent with Plaintiff's prior report, indicating Plaintiff is able to perform some activities but must frequently rest or receive assistance from family members. (R. at 237-44). Plaintiff reports that she goes to church less frequently and that her children tend to visit her at her own home. (R. at 241). Plaintiff also notes that she is only able to walk about twenty to twenty-five feet before needing to take a

break for about ten minutes before resuming walking. (R. at 242).

In a third adult function report dated November 28, 2010, Plaintiff reported ongoing problems associated with her rheumatoid arthritis, osteoarthritis and the development of ulcerations on her feet which cause pain and decrease her ability to walk. (R. at 255). Plaintiff continued to report the same restrictions in her ability to perform household chores and cooking as discussed in her prior adult function reports. (R. at 256). Plaintiff notes that she rarely drives now because driving causes pain in her foot and leg. (R. at 258). Plaintiff reports that she attends church only once or twice a month. (R. at 259). Plaintiff notes that she "just got out of the hospital where I had to have IV antibiotics for a foot ulcer related to the diabetes." (R. at 262).

### III.       CONTENTIONS OF THE PARTIES

Plaintiff, in her motion for summary judgment, asserts that the Commissioner's decision "is based upon an error of law and is not supported by substantial evidence."   (Pl.'s Mot. at 1.) Specifically, Plaintiff alleges that:

- Substantial evidence shows that Plaintiff suffered from extensive ulcerating skin lesions for over three months despite prescribed treatment and therefore, the ALJ erred by finding that Plaintiff did not meet Listing 8.04. New and material evidence was submitted to the Social Security Appeals Council and incorporated into the record that supports this conclusion. (R. at 1-6).

- The ALJ erred by not including all of the limitations posed by Plaintiff's severe impairments because the ALJ failed to acknowledge Plaintiff's need to elevate her feet and failed to provide a valid explanation as to why leg elevation was left out of the decisional RFC. In doing so, the ALJ improperly discounted the opinion of Plaintiff's treating physician, Dr. Mahmoud.

(Pl.'s Mem. in Supp. of Mot. for Summ. J. ("Pl.'s Mem.") at 4, 8, ECF No. 17). Plaintiff asks the Court to find that Plaintiff is disabled "as she either meets Listing 8.04 or she is incapable of performing substantial gainful activity due to the need to elevate her legs for more than ten (10)

percent of the work-day outside of customary break periods." (*Id.* at 14). Or alternatively, that the

Court "remand the case to the Commissioner with the order to find Ms. Irvin meets Listing 8.04 or

remand to allow the Commissioner to include the leg elevation limitation in Ms. Irvin's RFC."

(*Id.*).

Defendant, in her motion for summary judgment, asserts that the decision is "supported by

substantial evidence and should be affirmed as a matter of law." (Def.'s Mot. at 1). Specifically,

Defendant alleges that:

- Substantial evidence supports the ALJ's finding that Plaintiff did not meet Listing 8.04 and any evidence presented to the Appeals Council is not new and material and therefore there is no justification for remand.

- Substantial evidence supports the ALJ's RFC finding because the evidence did not support finding a limitation allowing Plaintiff to elevate her feet periodically throughout the day because the ALJ did not find Plaintiff's complaints to be fully credible.

- Substantial evidence supports the ALJ's rejection of Dr. Mahmoud's opinion of disability because the ALJ's conclusion that Dr. Mahmoud's opinion was "conclusory in nature, not consistent with the medical evidence of record as a whole, over a year old, and failed to explain why Plaintiff could not return to work or mention any evidence that would support that opinion. (R. at 874)" is specific, well-supported and legally as well as factually accurate.

(Def.'s Br. in Supp. Of Def.'s Mot. for Summ. J. ("Def.'s Br.") at 8, 11, 14, ECF No. 19).

## IV.     STANDARD OF REVIEW

The United States Court of Appeals for the Fourth Circuit ("Fourth Circuit") applies the

following standards in reviewing the decision of an ALJ in a Social Security disability case:

> Judicial review of a final decision regarding disability benefits…is limited to determining whether the findings…are supported by substantial evidence and whether the correct law was applied. *See* 42 U.S.C. § 405(g) ("The findings…as to any fact, if supported by substantial evidence, shall be conclusive…");
> *Richardson v. Perales*, 402 U.S. 389, 390, 91 S. Ct. 1420, 1422 (1971); *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). The phrase "supported by substantial evidence" means "such relevant evidence as a reasonable person might accept as

16

adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. at 401, 91 S. Ct. at 1427 (citing *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 216 (1938))…If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). Thus, it is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment…if the decision is supported by substantial evidence. *See Laws v. Celebrezze*, 368 F.2d at 642; *Snyder v. Ribicoff*, 307 F.2d 518, 529 (4th Cir. 1962).

*Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). The Fourth Circuit has defined substantial evidence as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. *Laws,* 368 F.2d at 642.

Because review is limited to whether there is substantial evidence to support the ALJ's conclusion, "[t]his Court does not find facts or try the case *de novo* when reviewing disability determinations." *Seacrist v. Weinberger*, 538 F.2d 1054, 1056-57 (4th Cir. 1976). Furthermore, "the language of § 205(g)…requires that the court uphold the decision even should the court disagree with such decision as long as it is supported by 'substantial evidence.'" *Blalock v. Richardson*, 483 F.2d 773, 776 (4th Cir. 1972) (emphasis added).

## V.    DISCUSSION

### A.    *Standard for Disability and the Five-Step Evaluation Process*

To be disabled under the Social Security Act, a claimant must meet the following criteria:

An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work . . . . "[W]ork which exists in the national economy" means work which exists in significant numbers either in the region

17

where such individual lives or in several regions of the country.

*See* 42 U.S.C. § 423(d)(2)(A) (2006). The Social Security Administration uses the following

five-step sequential evaluation process to determine if a claimant is disabled:

> (i) At the first step, we consider your work activity, if any.   If you are doing substantial gainful activity, we will find that you are not disabled.
>
> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement…or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.
>
> (iii) At the third step, we also consider the medical severity of your impairments(s). If you have an impairment(s) that meets or equals one of our listings…and meets the duration requirement, we will find that you are disabled.
>
> [Before the fourth step, the residual functioning capacity of the claimant is evaluated based "on all the relevant medical and other evidence in your case record . . . ." 20 C.F.R. §§ 404.1520; 416.920 (2011).]
>
> (iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.
>
> (v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. §§ 404.1520; 416.920 (2011). If the claimant is determined to be disabled or not

disabled at a step, the process does not go on to the next step. *Id.*

**B.      *Discussion of the Administrative Law Judge's Decision***

Utilizing the five-step sequential evaluation process described above, the ALJ made the

following findings:

**1.   The claimant meets the insured status requirements of the Social Security Act through December 31, 2014.**

2. The claimant has not engaged in substantial gainful activity since March 13, 2010, the alleged onset date (20 CFR 404.1571 *et seq*., and 416.971 *et seq*.).

3. The claimant has the following severe impairments: chronic obstructive pulmonary disease; rheumatoid arthritis; fatty liver; diabetes with neuropathy; hypertension; bilateral carpals tunnel syndrome, status post bilateral carpals tunnel release; obstructive sleep apnea; history of right foot ulcer; bipolar disorder; and mood disorder (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b). However, several limitations reduce the claimant's ability to perform the entire range of light work. The claimant is limited to occasional stooping, kneeling, crouching, crawling, and climbing of ramps and stairs. She may not balance or climbing [sic] ladders, ropes, or scaffolds. The claimant must not engage in bilateral foot control operation. She is capable of frequent left side handling. The claimant must have a sit/stand option that allows her to alternate between the sitting and standing positions at 30-minute intervals throughout the workday without breaking task. She must avoid concentrated exposure to extreme hot and cold temperature, wetness, humidity, and irritants such as fumes, dust, odors, gases and poorly vented areas. The claimant must avoid even moderate exposure to vibrations and hazards, including dangerous machinery and unprotected heights. She is limited to tasks that involve short and simple instructions in a low stress environment. In this case, the definition of a low stress environment is one that only requires occasional decision-making, occasional changes in the work setting, and no fast-paced production work. The claimant may only have occasional interaction with the public, supervisors, and co-workers.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 20 CFR 416.965).

7. The claimant was born on March 19, 1963 and was 46 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education and is able to communicate in

**English (20 CFR 404.1564 and 416.964).**

9. **Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (20 CFR 404.1563 and 416.968).**

10. **Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant number in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).**

11. **The claimant has not been under a "disability, as defined in the Social Security Act, from March 13, 2010, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).**

(R. at 16-30).

C.     *The ALJ's Decision is Not Supported by Substantial Evidence based on a Review of the Entire Record, Including New and Material Evidence Submitted to the Appeals Council*

    **1.  Evidence Submitted to the Appeals Council is New and Material Evidence**

Social Security Regulations permit a claimant to submit additional evidence when requesting review by the Appeals Council. 20 C.F.R. § 416.1470(b). The Appeals Council must consider evidence submitted with the request for review "if the additional evidence is (a) new, (b) material, and (c) relates to the period on or before the date of the ALJ's decision." *Wilkins v. Sec'y, Dep't of Health and Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991) (citing *Williams v. Sullivan*, 905 F.2d 214, 216 (8th Cir. 1990)); *see also* 20 C.F.R. § 404.970 (2011). Evidence is new if it is not "duplicative or cumulative." *Wilkins*, 953 F.2d at 96. "Evidence is material if there is a reasonable possibility that the new evidence would have changed the outcome." *Id.*

The Appeals Council "is required to consider new and material evidence relating to the period on or before the date of the ALJ decision in deciding whether to grant review." *Id.* at 95. After evaluating the record, including the newly submitted evidence, the Appeals Council will

only grant the request for review "if it finds that the administrative law judge's action, findings, or conclusion is contrary to the weight of the evidence currently of record." 20 C.F.R. § 404.970 (2011). If the Appeals Council rejects the request for review, the Appeals Council is not required to explain its analysis or rationale in denying the request. *See Meyer v. Astrue*, 662 F.3d 700, 702 (4th Cir. 2011). The Fourth Circuit has noted that "an express analysis of the Appeals Council's determination would [be] helpful for purposes of judicial review," but such an analysis is not required. *Id.* (quoting *Martinez v. Barnhart*, 444 F.3d 1201, 1207–08 (10th Cir. 2006)). After the Appeals Council considers the new and material evidence, the evidence is incorporated into the administrative record. Thus, the reviewing court "must review the record as a whole, including the new evidence, in order to determine whether substantial evidence supports the Secretary's findings." *Id.* at 96.

In the present case, the new and material evidence considered by the Appeals Council includes a letter from Plaintiff's treating physician. (R. at 935-37). The undersigned finds that Dr. Mahmoud's letter is both new and material. The evidence is new because it is not duplicative or cumulative. The letter includes Plaintiff's treating physician's opinion as to Plaintiff's conditions, limitations and prognosis; these opinions were not previously expressed in the record. (R. at 935-37). The letter might reasonably have changed the ALJ's conclusion that Plaintiff was not disabled because the ALJ is entitled to give controlling or great weight to the opinion of the treating physician. Depending on the weight given to Dr. Mahmoud's opinion as expressed in the new letter, the evidence has a reasonable possibility of changing the ALJ's decision. Additionally, while the letter is dated July 23, 2012, after the issuance of the ALJ's decision, the letter pertains to Plaintiff's medical condition prior to the rendering of the ALJ's decision. Therefore, the

undersigned finds that the letter is new and material evidence relating to the period prior to the ALJ decision and the Appeals Council properly considered the evidence.

The evidence considered by the Appeals Council also includes medical records relating to the diagnosis and treatment of Plaintiff's foot ulcers. (R. at 938-1055). The evidence includes medical records from Plaintiff's treating physician, Dr. Mahmoud, Plaintiff's treating podiatrist, Dr. Anderson, Stonewall Jackson Memorial Hospital Emergency Department, and the Wound Care Center at United Hospital Center. The records span a time frame from December 29, 2011 to May 2, 2012. This evidence is new because it contains medical records not previously included in the record and therefore is not cumulative or duplicative. The evidence is also material because there is a reasonable possibility it would have changed the ALJ's decision, particularly because the ALJ found that there was no medical evidence for treatment for Plaintiff's ulcers other than "one instance in November 2010" and then later found that "there is no medical evidence of further foot ulcerations" after May 21, 2010. (R. at 19). The new medical records demonstrate a pattern of diagnosis and treatment for persistent foot ulcerations for a five (5) month period and therefore, have a reasonable possibility of changing the ALJ's findings. Some of the medical records relate to the period after the date of the ALJ decision and the undersigned did not consider these records.

Accordingly, the undersigned finds that Dr. Mahmoud's letter and the medical records relating to the period prior to the ALJ decision are new and material evidence and the Appeals Council properly considered the evidence and incorporated it into the record. Therefore, the Court reviews the entire record, including the new evidence, pursuant to *Wilkins*.

### 2. Substantial Evidence Does Not Support the ALJ's Findings and Decision

Based on this review of the entire record, including the new and material evidence, the

undersigned finds that substantial evidence does not support the ALJ's decision that Plaintiff is disabled. The new and material evidence includes a letter from Plaintiff's treating physician stating his opinion that Plaintiff is unable to return to work and describing in detail her medical conditions, associated limitations and prognosis. The new evidence also includes numerous medical records regarding diagnosis and treatment for Plaintiff's foot ulcers from December 2011 through the date of the ALJ's decision. The Court finds that this new evidence conflicts with other evidence in the record relied upon by the ALJ and fills an evidentiary gap in the record.

The *Meyer* case provides an illustration of the Fourth Circuit's analysis when new and material evidence conflicts with other record evidence relied on by the ALJ. *Meyer*, 662 F.3d at 702. In the *Meyer* case, the plaintiff was found to not be disabled and sought review by the Appeals Council. *Id.* at 703. Meyer submitted new evidence to the Appeals Council, which included an opinion letter from his treating physician. *Id.* The Appeals Council denied Meyer's request for review but did incorporate the treating physician's letter into the record. *Id.* at 704. The district court thus considered the record as a whole, including the new evidence, and affirmed the Commissioner's decision. *Id.* Meyer appealed, and the Fourth Circuit remanded the case because "[o]n consideration of the record as a whole, we simply cannot determine whether substantial evidence supports the ALJ's denial of benefits." *Id.* at 707. The Court reasoned that the ALJ suggested an "evidentiary gap played a role in its decision" because the record did not contain any restrictions placed on Meyer's by his treating physician. *Id.* The new evidence filled this evidentiary gap. In addition, the Court explained that the new evidence conflicts with "other record evidence credited by the ALJ." *Id.* In conclusion, the Court found that:

> no fact finder has made any findings as to the treating physician's opinion or attempted to reconcile that evidence with the conflicting and supporting evidence in the record.

Assessing the probative value of competing evidence is quintessentially the role of the fact finder. We cannot undertake it in the first instance. Therefore, we must remand the case for further fact finding.

*Id.* The Court thus reversed the district court and remanded the case with instructions for the district court to reserve the Commissioner's decision and remand the case for a rehearing. *Id.*

The absence of additional fact finding "does not render judicial review 'impossible' – as long as the record provides 'an adequate explanation of [the Commissioner's] decision,'" and substantial evidence supports the ALJ's findings. *Meyer*, 662 F.3d at 702 (quoting *DeLoatche v. Heckler*, 715 F.2d 148 (4th Cir.1983)). When a review of the new evidence still allows the conclusion that substantial evidence supports the ALJ's decision, the ALJ's denial of benefits should be affirmed. However, "when consideration of the record as a whole revealed that new evidence from a treating physician was not controverted by other evidence in the record, we have reversed the ALJ's decision and held that the ALJ's denial of benefits was 'not supported by substantial evidence.'" *Meyer*, 662 F.3d at 702 (quoting *Wilkins*, 953 F.2d at 96). Additionally, when the new evidence conflicts with "other record evidence credited by the ALJ," the Fourth Circuit has found remand to be the appropriate remedy. *Id.* at 707; *see also Smith v. Chater*, 99 F.3d 635, 638 (4th Cir. 1996) (finding that "[t]he duty to resolve conflicts in the evidence rests with the ALJ, not with a reviewing court.").

In the present case, Plaintiff's treating physician, Mr. Mahmoud, provided a two and a half page letter to the Appeals Council. (R. at 935). In the letter, Dr. Mahmoud discusses the diagnosis of Plaintiff's bilateral lower leg diabetic neuropathy in 2010 and then the subsequent development of foot ulcers. (R. at 935-36). For treatment of the ulcers, Dr. Mahmoud states that Plaintiff received general wound care and needed to "elevate her legs as often as possible to assist in good

24

circulation to the lower extremities." (R. at 936). He explains that in November 2010 Plaintiff developed an ulcer on her right foot, which finally abated in May 2011 after six months of aggressive treatment. (R. at 936). Plaintiff again developed ulcers on both of her feet in December 2011, for which Plaintiff began treatment with a podiatrist and at the Wound Care Center. (*Id.*). Dr. Mahmoud further explains that Plaintiff experiences chronic pitting edema with standing and walking "unless she takes the opportunity to elevate her legs." (*Id.*). Dr. Mahmoud concluded that Plaintiff "easily develops foot ulcers which require intensive, lengthy and aggressive treatment." (*Id.*). He stated that Plaintiff "is extremely limited in her ability to sustain walking for even two city blocks, not only from an exertional standpoint, but she is at such risk of developing sores, blisters, or ulcerations, that I just cannot recommend that she walk much more than sporadically throughout the day." (*Id.*). He further recommended that Plaintiff needs to elevate her legs at frequent intervals throughout the day in order to aid in lower leg circulation due to the presence of diabetic ulcers and the constant threat of such ulcers. (R. at 937).

The new and material evidence also contained medical records from August 30, 2011 through the date of the ALJ's decision, March 21, 2012. Within these medical records, relevant evidence related to Plaintiff's foot ulcers are noted on December 29, 2011 (R. at 977), January 14, 2012 (R. at 939, 979), January 19, 2012 (R. at 939), January 26, 2012 (R. at 938), February 7, 2012 (*Id.*), February 22, 2012 (R. at 996, 1012), February 29, 2012 (R. at 1010), March 21, 2012 (R. at 1013), April 1, 2012 (R. at 1024), April 4, 2012 (R. at 1025), April 18, 2012 (R. at 1014), and May 1, 2012 (R. at 995, 1019). A detailed summary of these records is provided above.

The Court finds that the information and opinions contained in Dr. Mahmoud's letter and the new medical records presented to the Appeals Council conflict with other record evidence

credited by the ALJ and fill an evidentiary gap as noted by the ALJ. When considering Plaintiff's severe impairments, the ALJ included Plaintiff's "history of right foot ulcer" but appeared to conclude that the development of such ulcers had abated. (R. at 17). As such, the ALJ further noted Plaintiff is able to "walk on heels and toes." (*Id.*). In considering whether Plaintiff met the listing requirement of 8.04 for chronic infections of the skin, the ALJ found that there was "no evidence that the claimant's right foot ulcer persisted for at least three months despite continuation of treatment as prescribed. Although the claimant testified that foot ulcerations continue, there is no medical evidence for any treatment for this condition other than once instance in November 2010." (R. at 19). Later in the decision, the ALJ noted the Plaintiff had foot ulcers on November 27, 2010, January 21, 2011 and May 2, 2011 but stated "there is no medical evidence of further foot ulcerations after [May 2, 2011]." (R at 26). The ALJ again emphasized "the medical evidence does not document any foot ulcerations since May 2, 2011." (R. at 26). The ALJ further found that Plaintiff "testified that Dr. Anderson has followed her to a [sic] current right foot ulcer for the past three months, but there is no evidence supporting this testimony in the medical record. As of November 21, 2011, there is no mention of any foot ulcer in the medical records." (R. at 26). While the ALJ presented conflicting findings as to the number of records demonstrating the presence of foot ulcers and the last date in the record showing foot ulcers, the ALJ based his findings on an understanding that there were only limited references to foot ulcers in the record and that such ulcers were not consistently or currently present. Additionally, when determining Plaintiff's RFC, the ALJ made no mention of leg elevation. (R. at 22). The ALJ thus found that Plaintiff could perform light work and stated that "there is no basis for finding greater limitations." (R. at 28).

      Dr. Mahmoud's letter not only conflicts with the findings of the ALJ but also provides

evidence of greater limitations than previously presented to the ALJ. Even though the ALJ did have before him an opinion letter by Dr. Mahmoud, Dr. Mahmoud's July 23, 2012 letter does not merely restate this prior opinion weighed and rejected by the ALJ. For example, Dr. Mahmoud's January 26, 2011 letter read, in whole: "The above patient has multiply [sic] medical problems. She has Rheumatoid Arthritis, Right foot Ulcer/Cellulitis, Asthma, Hypertension, Allergic Rhinitis, and type 2 Diabetes. Due to her medical problems they are affecting her work capacity and she is unable to return to work." (R. at 874). The ALJ rejected Dr. Mahmoud's opinion as expressed in the initial letter because "Dr. Mahmoud's opinion is conclusory in nature, not consistent with the medical evidence of record as a whole, over a year old, and failed to explain why Plaintiff could not return to work or mention any evidence that would support that opinion." (R. at 28). The ALJ afforded the "least weight" to Dr. Mahmoud's opinion in this initial letter because "the opinion is too limited in scope, lacks familiarity with the Social Security Agency disability program, and may tread on the ultimate issue of disability reserved for the Commission." (*Id.*). Dr. Mahmoud's July 23, 2012 letter submitted to the Appeals Council, however, provides a greater overview of Plaintiff's conditions, diagnoses, treatments and limitations in addition to his opinion that Plaintiff is unable to return to work. (R. at 935-37).

The ALJ never considered the limitations and recommendations made by Dr. Mahmoud in this July 23, 2012 letter. "[A] treating physician's opinion is entitled to great weight and may be disregarded only if persuasive contradictory evidence exists to rebut it." *Craig v. Chater*, 76 F. 3d 585, 589 (4th Cir. 1996). Here, the Court does not know what weight, if any, would be accorded to Dr. Mahmoud's more comprehensive assessment of Plaintiff's condition, the greater limitations he places on Plaintiff's abilities, and his ultimate opinion that Plaintiff is unable to work. Moreover,

Dr. Mahmoud's letter submitted to the Appeals Council conflicts with many of the ALJ's findings as discussed above. Dr. Mahmoud's letter includes greater limitations not previously expressed in the record, such as time limitations on Plaintiff's ability to walk and the need for Plaintiff to elevate her legs at frequent intervals throughout the day. Dr. Mahmoud's letter states that Plaintiff easily develops foot ulcers that require aggressive treatment and he describes the steps taken in an attempt to treat these ulcers. While the ALJ is not required to give controlling weight to Dr. Mahmoud's opinion and may even assign lesser weight to the treating doctor's opinion, the ALJ must give sufficient reasons to make clear to any subsequent reviewers the weight given and why. *See* SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996); *see also Smith v. Astrue*, No. 2:11-CV-77, slip op. at 10-11 (N.D. W. Va. June 13, 2012) (Bailey, C.J.). Here, the undersigned cannot undertake the responsibility of assessing the probative value of Dr. Mahmoud's letter, a task which must be completed by a fact finder. *See Meyer*, 662 F.3d at 707.

Similarly, the medical records show a consistent pattern of development and treatment of foot ulcers through the date of the ALJ's decision. The ALJ specifically noted the absence of medical records supporting Plaintiff's testimony that she continued to struggle with foot ulcers. The new evidence supports Plaintiff's testimony, fills this evidentiary gap and conflicts with the ALJ's finding that Plaintiff had a "history" of foot ulcers rather than an ongoing and current medical problem. When the new evidence creates a conflict with existing evidence or fills an evidentiary gap, such new evidence must be weighed. *See Burner v. Colvin*, 2:13-CV-28, 2014 WL 1479201 (N.D. W. Va. Apr. 15, 2014) (citing *Meyer*, 662 F.3d at 706). As the Fourth Circuit made clear "[a]ssessing the probative value of competing evidence is quintessentially the role of the fact finder. We cannot undertake it in the first instance." *Meyer*, 662 F.3d at 707. The Court

cannot find that substantial evidence supports the ALJ's decision when the ALJ made findings without the benefit of the new and material evidence, which the Court finds conflicts with other record evidence credited by the ALJ and fills an evidentiary gap as discussed above. Accordingly, the undersigned recommends remanding the case for further fact finding.

## VI.    RECOMMENDATION

For the reasons herein stated, I find that the Commissioner's decision denying the Plaintiff's application for Disability Insurance Benefits and Supplemental Security Income is not supported by substantial evidence. Accordingly, I **RECOMMEND** that Defendant's Motion for Summary Judgment (ECF No. 18) be **DENIED**, Plaintiff's Motion for Summary Judgment (ECF No. 16) be **GRANTED** and the decision of the Commissioner be remanded for further fact finding with regard to the new and material evidence.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection.   A copy of such objections should also be submitted to the Honorable John Preston Bailey, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); *Thomas v. Arn,* 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v Schronce*, 727 F.2d 91 (4th Cir. 1984), *cert. denied*, 467 U.S. 1208 (1984).

The Court directs the Clerk of the Court to provide a copy of this Report and Recommendation to all counsel of record, as provided in the Administrative Procedures for

Electronic Case Filing in the United States District Court for the Northern District of West

Virginia.

Respectfully submitted this July 16, 2014.

ROBERT W. TRUMBLE
UNITED STATES MAGISTRATE JUDGE